## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**TERESA S.,[1]**

      **Plaintiff,**

**v.**                              **Case No.: 2:22-cv-00394**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 8, 9).

The undersigned has fully considered the evidence and the arguments of counsel.

---

[1] The Court lists only the first name and last initial of any non-government parties in Social Security opinions pursuant to the October 31, 2022 Standing Order in this District, which adopts the recommendation of the May 2018 Judicial Conference Committee on Court Administration and Case Management concerning privacy of personal and medical information.

For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On November 11, 2019, Plaintiff Teresa S. ("Claimant") protectively filed for DIB, alleging a disability onset date of June 25, 2014 due to "anxiety, depression, scoliosis, neuropathy, [arthritis], back problems, herniated disc, and neck issues from car accident." (Tr. at 217, 234). After the Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration, Claimant filed a request for an administrative hearing, which was held on November 18, 2021 before the Honorable M. Jerry Meade, Administrative Law Judge (the "ALJ"). (Tr. at 33-49). By written decision dated December 6, 2021, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 7-27). The ALJ's decision became the final decision of the Commissioner on July 25, 2022 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 6, 7). Claimant filed a Brief in Support of Complaint, (ECF No. 8), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 9), to which Claimant filed a reply, (ECF No. 10). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 53 years old on her alleged disability onset date and 58 years old on

her date last insured. (Tr. at 50). She completed high school, communicates in English, and previously worked as a senior administrative assistant. (Tr. at 233, 235).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination,

3

the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. WeinBerger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or

4

managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through December 31, 2019. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity from June 25, 2014, the alleged disability onset date, through December 31, 2019, her date last insured. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: osteoarthritis of the knees, degenerative disc disease of the lumbar spine, and asthma. (*Id.*, Finding No. 3). The ALJ considered Claimant's dry eyes, right hip pain, plantar fasciitis, and depression, but found that the impairments were non-severe. (Tr. at 13-14).

Further, the ALJ determined that Claimant's neck and hand pain, neuropathy, disc herniation, scoliosis, anxiety, and transient ischemic attack (TIA) or ministroke were not medically determinable impairments. (Tr. at 14).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-16, Finding No. 4). The ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb, crouch, and crawl. She can frequently balance, stoop, and kneel. She must avoid concentrated exposure to extreme cold; vibrations; irritants such as fumes, dust, odors, gases, and poorly ventilated areas; and hazards such as moving machinery and unprotected heights.

(Tr. at 16-20, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could perform her past relevant work as a senior administrative assistant. (Tr. at 20, Finding No. 6). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 20-21, Finding No. 7).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two challenges to the Commissioner's decision denying her application for DIB. First, she contends that the ALJ erred in finding that her hand impairment was not a non-medically determinable impairment, and by not considering associated functional limitations at subsequent steps of the sequential evaluation. (ECF No. 8 at 5-8). Second, Claimant argues that the ALJ erred by not assessing any mental RFC limitations, despite finding that she had mild mental limitations at step two, or by not explaining why no restrictions were necessary. (*Id.* at 8-12).

In response, the Commissioner contends that Claimant failed to establish that she had a medically determinable hand impairment, that her mild limitations in the four broad categories of mental functioning did not warrant RFC limitations, and that the ALJ properly determined pursuant to a vocational expert's ("VE") testimony that Claimant could return to her past relevant position. (ECF No. 9 at 8-15). Claimant reasserts in her reply to the Commissioner's response that the absence of explanation of how the ALJ considered Claimant's mental limitations beyond step two of the sequential evaluation precludes meaningful review. (ECF No. 10 at 2).

## V.   Relevant Evidence

The undersigned examined all of the evidence in the record. The following evidence is most relevant to the issues in dispute.

### A. Treatment Records

#### 1. Pre-Date Last Insured

On March 15, 2016, Claimant presented for a routine follow-up appointment with her primary care provider, Mary Jenkins, M.D. Claimant expressed that Ambien was not very effective for her insomnia, but she had restless legs when she did not take it. (Tr. at 517). She was otherwise doing well and remained active with her grandchildren. (*Id.*). On examination, Claimant displayed good judgement, had normal mood, and was active and alert. (*Id.*). Dr. Jenkins prescribed Effexor for depression and Lunesta for insomnia. (*Id.*).

On September 11, 2017, Claimant advised Dr. Jenkins that her mood was good, and she felt that Lunesta was working well for her. (Tr. at 504). Her right hip and knee hurt, but she had no other complaints. (*Id.*). Claimant still tried to remain active with her grandchildren, displayed good judgement and normal mood, and appeared alert. (*Id.*). Her mental diagnoses and treatment plan were unchanged. (*Id.*).

During a subsequent appointment on October 9, 2018, Claimant told Dr. Jenkins that her medications were working well except for Lunesta, which was not as effective. (Tr. at 493). She said that her mood was good, and she stayed active with her grandson. (*Id*.). Claimant complained of increased pain in her hand joints and easier bruising on her arms, but she was otherwise doing well. (*Id*.). She still had restless legs if she did not take her sleeping medication. (*Id*.). Claimant displayed good judgement, had normal mood, and was active and alert. (*Id*.). Dr. Jenkins renewed Claimant's prescription for Effexor, prescribed Ambien in place of Lunesta for insomnia, and prescribed meloxicam for hand joint pain. (Tr. at 494).

There were no changes to the above examination findings, diagnoses, or medications on March 25, 2019. (Tr. at 489). Claimant's only subjective complaint at that time was increased pain in her distal interphalangeal (DIP) finger joints. (*Id*.). On September 30, 2019, Dr. Jenkins documented the same History of Present Illness (HPI), but she did not record a diagnosis or treatment for hand joint pain. (Tr. at 485-86). Claimant still displayed good judgement, had normal mood, and was active and alert. (Tr. at 485). She continued to take her depression and insomnia medications. (Tr. at 486).

### 2. Post-Date Last Insured

On December 7, 2020, Claimant reported to Dr. Jenkins that her medications were working "ok," her mood was good, and she was trying to stay active with her grandchildren. (Tr. at 662). She continued to have more pain in her left thumb joint and other joints, and her fingertips were very sensitive. (*Id*.). Claimant showed good judgment, displayed normal mood and affect, and was active and alert during the appointment. (*Id*.). Dr. Jenkins noted a bony deformity in Claimant's index DIPs and tenderness at the base of Claimant's left thumb, but the Phalen and Tinnel's tests were

negative. (*Id.*). Claimant's rheumatoid arthritis panel was negative, and Dr. Jenkins renewed Claimant's prescriptions for Effexor and Ambien, as well as ordered a left hand x-ray. (Tr. at 663, 678). The left hand x-ray, which was performed on December 9, 2020, showed no acute fractures, dislocations, or other acute bony abnormalities. (Tr. at 677). Three days later, on December 10, 2020, Dr. Jenkins referred Claimant to a hand surgeon. (Tr. at 676).

On February 3, 2021, Claimant presented to orthopedic specialist, Sandra Finley, APRN, FNP-C, for left thumb pain. (Tr. at 704). Claimant stated that she "fell back in June," and she felt pain around the base of her thumb, but her x-ray was normal. (*Id.*). She also had sensitivity in her fingertips that would "come and go." (*Id.*). All of Claimant's examination findings were normal except for positive Durkan's compression tests bilaterally. (Tr. at 705). Claimant's sensation remained intact to light touch. (*Id.*). Nurse Practitioner Finley diagnosed Claimant with bilateral carpal tunnel syndrome and left thumb carpometacarpal (CMC) joint arthritis and prescribed a brace for Claimant to wear on her left thumb at nighttime and a carpal tunnel brace for her dominant right extremity. (*Id.*). She discussed increasing Claimant's dosage of meloxicam if Claimant was "having enough pain," and she stated that injections and surgery were potential options if Claimant did not improve with conservative care. (*Id.*).

Claimant followed up with Nurse Practitioner Finley on March 17, 2021. She was wearing her braces on the wrong hands. (Tr. at 707). Claimant was not experiencing as much numbness and tingling in her hands, and was she was most concerned about pain at the base of her left thumb and weakness and trouble gripping things bilaterally. (*Id.*). Claimant reported that she suffered from right arm numbness after a car accident when she was 19 or 20, but she went to a chiropractor and her symptoms improved. (*Id.*). On

examination, Claimant had tenderness in her left thumb CMC joint, which was stable to stress and grind. (*Id.*). She could make a full composite fist, and all flexor, extensor, and intrinsic muscles were intact. (*Id.*). Claimant's skin was warm, dry, pink, and undamaged. (*Id.*). She had some intrinsic atrophy, but her sensation was intact to light touch. (*Id.*). Nurse Practitioner Finley diagnosed Claimant with bilateral upper extremity weakness and left carpometacarpal joint arthritis. (*Id.*). She ordered EMG testing, advised Claimant to wear the braces on the proper appendages, and gave Claimant a depo-medrol and lidocaine injection in her left thumb joint. (Tr. at 707-08). The EMG nerve conduction studies performed on April 1, 2021 showed bilateral chronic C7 radiculopathy and denervation changes without evidence of entrapment neuropathy or plexopathy. (Tr. at 690).

On May 25, 2021, neurosurgeon Jeffery Kim, M.D., examined Claimant concerning neck and right upper extremity pain and subjective weakness that was worsening over the past three to four years. (Tr. at 754). Claimant complained of hand pain and changes in her handwriting and fine motor skills in her right hand. (*Id.*). Her strength was 5/5 in all muscles and her sensation was intact, but her Hoffman's sign was positive bilaterally and she was hyperreflexive. (Tr. at 755). Dr. Kim diagnosed Claimant with cervical spondylosis with myelopathy, and he ordered an MRI. (Tr. at 756). The cervical spine MRI was performed on June 24, 2021. It showed multilevel degenerative disc disease, but normal signal and caliber in Claimant's spinal cord and no spinal or neural foraminal stenosis. (Tr. at 697).

### B. Evaluations, Opinions, and Prior Administrative Findings

On February 10, 2020, state agency physician Rabah Boukhemis, M.D., assessed that Claimant could perform light exertional work that involved frequent balancing,

stooping, and kneeling and occasional climbing, crouching, and crawling with no concentrated exposure to extreme cold, vibration, or hazards. (Tr. at 57-58). Dr. Boukhemis opined that Claimant did not have any manipulative limitations. (Tr. at 58). Cindy Osborne, D.O., affirmed these findings on July 16, 2020. (Tr. at 71-73).

On March 9, 2020, psychologist Nicole Smith, M.A., performed an Adult Mental Status Examination of Claimant. Claimant resided with her husband of 41 years, who was employed as an underground mine inspector. (Tr. at 625). She drove herself approximately 31 miles to the examination. (*Id.*). Claimant stated that she was applying for benefits because she had an "aural event" in 2012, which was initially believed to be a mini stroke, and she thereafter found it difficult to follow steps such as in a recipe or find words. (*Id.*). Claimant also expressed that she had arthritis, neck problems, sensitive fingertips, and plantar fasciitis. (*Id.*). She noted that she took medications for depression and anxiety that were prescribed by her primary care provider, and she did puzzles to try to keep her "mind fresh." (Tr. at 625-26). Her daily routine included eating meals, taking medication, keeping scheduled appointments, getting dressed, watching television, and performing all self-care duties independently. (Tr. at 629). She also performed household chores, including laundry, cleaning the kitchen, and sweeping. (*Id.*). Based on Claimant's records and presentation during the examination, Ms. Smith diagnosed Claimant with mild somatic symptom disorder, mild neurocognitive disorder, unspecified depressive disorder, and generalized anxiety disorder. (Tr. at 628).

On April 29, 2020, state agency psychologist Debra Lilly, Ph.D., assessed that Claimant had mild limitations in the paragraph B criteria, noting that the activities reported in Claimant's function report and consultative examination did not reflect any functional deficits related to a mental disorder. (Tr. at 55-56). Joseph Richard, Ed.D.,

affirmed these findings on July 21, 2020. (Tr. at 69-70).

### C. Claimant's Statements

On June 28, 2020, Claimant completed an Adult Function Report, stating that her daily activities included brushing her teeth, making the bed, performing light housework, doing laundry, picking her grandchildren up from school, cooking, watching television, reading, doing ancestry research, and bathing. (Tr. at 287). She had no limitations performing personal care and drove, but her husband had to help her with some household chores and yard work. (Tr. at 287-89).

Claimant later testified during her administrative hearing on November 18, 2021 that she had only one job from the late 1990s until June 2014, which ended due to a "reduction in workforce." (Tr. at 39). When she ceased working, her neck issue was causing problems with her hands and right arm. (*Id.*). Claimant explained that she suffered a neck injury in the early 1980s, and it progressively worsened until she had problems with the "sensation of touch" and lack of coordination in her right hand. (Tr. at 41). Claimant testified that she had diminished fine motor skills, which negatively impacted her ability to write and type. (Tr. at 42-43). She also had trouble making decisions and issues with her memory after she experienced an aural event. (Tr. at 44).

### VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

Claimant argues that the ALJ's analysis of her hand and mental impairments is not supported by substantial evidence, as follows:

### A. *Hand Impairment*

Claimant first challenges the ALJ's finding that her hand impairment was not medically determinable. At the second step of the sequential evaluation, the ALJ determines whether a claimant has medically determinable impairments, and, if so, whether such impairments are severe within the meaning of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521. A medically determinable impairment "must be established by objective medical evidence from an acceptable medical source," and the SSA "will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." *Id.* at § 404.1521.

As section DI 24501.020 of the SSA's Program Operations Manual System (POMS) explains, "[o]bjective medical evidence means signs, laboratory findings, or both." The term "signs" is defined as "one or more anatomical, physiological, or psychological abnormalities that are observable, apart from the claimant's statements (description of symptoms)," and the "[s]igns must be shown by medically acceptable clinical diagnostic techniques." DI 24501.020 Establishing a Medically Determinable Impairment (MDI), Social Security Administration Program Operations Manual, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424501020. "Laboratory findings" are defined as "one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id.* Finally, "[d]iagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.*

In this case, the ALJ considered Claimant's reported neck and hand pain, neuropathy, and disc herniation. (Tr. at 14). However, the ALJ found that the medical evidence showed negative examinations of the neck and hands, no abnormal neurologic findings, and no radiological evidence of herniated discs. (*Id.*). Therefore, the ALJ found that Claimant's neck and hand pain, neuropathy, and disc herniation were not medically determinable impairments. (*Id.*).

Claimant argues that the ALJ erred in finding that her hand impairment was not medically determinable because she subjectively complained of pain in her finger joints and fingertip sensitivity, and her physician prescribed meloxicam for those complaints; her treating physician later referred her for hand surgery after her date last insured; and Claimant testified that she had diminished fine motor skills and sensation in her hands,

lack of control and numbness in her right arm, and pain in her hands. (ECF No. 8 at 6-7). However, as discussed, Claimant's subjective symptoms were insufficient to establish a medically determinable impairment. Claimant was required to offer objective evidence of the condition, which is defined as medical signs and/or laboratory findings. 20 C.F.R. § 404.1521; POMS DI 24501.020.

Claimant relies on two records before her date last insured concerning her hand impairment. On March 25, 2019, during a regular primary care appointment, Claimant complained of pain in her DIP joint, and Dr. Jenkins ordered an arthritis panel and renewed Claimant's prescription for meloxicam. (ECF No. 8 at 2); *see* (Tr. at 489). Claimant again reported DIP joint pain on September 30, 2019. (ECF No. 8 at 3); *see* (Tr. at 485). Yet, there is no objective evidence in either of the medical records cited by Claimant to establish a medically determinable hand impairment. (Tr. at 485, 489). Dr. Jenkins did not document any musculoskeletal abnormalities or note any other findings to indicate a hand impairment. (*Id.*). Rather, the diagnosis of "hand joint pain" and prescription for meloxicam was based purely on Claimant's subjective complaints. (Tr. at 489-90). A diagnosis, prescription or other treatment, or subjective complaints do not establish objective evidence of a medically determinable impairment. *See, e.g., Fisher v. Saul*, No. 3:20-CV-00290, 2020 WL 7414729, at *9 (S.D.W. Va. Dec. 1, 2020), *report and recommendation adopted,* 2020 WL 7409071 (S.D.W. Va. Dec. 17, 2020) ("A claimant's subjective symptoms, or even a diagnosis, do not establish a medically determinable impairment. 20 C.F.R. §§ 404.1521, 416.921. The record must contain objective evidence of the condition.")

As referenced by Claimant, in December 2020, almost one year after Claimant's date last insured, Dr. Jenkins noted on examination a bony deformity in Claimant's index

DIPs. (Tr. at 662). The Phalen and Tinnel's tests, left hand x-ray, and rheumatoid arthritis panel were all negative. (Tr. at 662, 677, 678). Dr. Jenkins referred Claimant for hand surgery. (Tr. at 676). Claimant saw an orthopedic nurse practitioner in February 2021, and all of her examination findings were normal except for positive Durkan's compression tests bilaterally. (Tr. at 705). Her sensation remained intact to light touch. (*Id.*). To any extent that Claimant suggests that these records or any other records after her date last insured established a medically determinable hand impairment, there is no indication that they were connected to her pre-date last insured condition.

Claimant was required to show that she became disabled on or before her date last insured. *See, e.g., Call v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00145-MR-WCM, 2023 WL 1093670, at *3 (W.D.N.C. Jan. 10, 2023), *report and recommendation adopted,* 2023 WL 1072014 (W.D.N.C. Jan. 27, 2023) (citing *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Evidence after that date can be relevant when an "inference of linkage" exists between the evidence and the claimant's pre-date last insured condition. *Id.*; *Joy Noel J. v. Kijakazi*, No. 6:21CV00026, 2022 WL 12068188, at *6 (W.D. Va. Oct. 20, 2022); *Hughes v. Kijakazi*, No. 1:21-CV-00364, 2022 WL 1284869, at *6 (S.D.W. Va. Mar. 7, 2022), *report and recommendation adopted,* 2022 WL 1275776 (S.D.W. Va. Apr. 28, 2022); *Shue v. Kijakazi*, No. 921CV03735TLWMHC, 2023 WL 1934932, at *8 (D.S.C. Jan. 26, 2023), *report and recommendation adopted,* 2023 WL 1930633 (D.S.C. Feb. 10, 2023). Here, however, there is no evidence to support such an inference of linkage between the subsequent records and Claimant's condition during the relevant period. The fact that Claimant's hand condition may have at some time after her date last insured worsened or become medically determinable is insufficient to undermine the ALJ's finding concerning the relevant period.

Furthermore, even if the ALJ erred at step two, which the Court finds he did not, the error was harmless because the ALJ proceeded with the evaluation and considered the effects of Claimant's hand impairment at subsequent steps. *Black v. Kijakazi*, No. 3:20-CV-00621, 2021 WL 4256808, at *6 (S.D.W. Va. Sept. 1, 2021), *report and recommendation adopted,* 2021 WL 4255620 (S.D.W. Va. Sept. 17, 2021) ("Courts often find that an error at step two is harmless when the ALJ found at least one severe impairment, proceeded with the sequential evaluation, and considered the effect of the challenged impairment(s) at subsequent steps of the analysis.") (citation omitted).

In assessing Claimant's RFC, the ALJ considered Claimant's statements that her neck pain radiated into her hands, her hand pain caused problems with typing, she had diminished fine motor skills, and she had a muscle problem that impacted her coordination. (Tr. at 17). However, the ALJ cited that the medical evidence showed normal examinations of Claimant's neck and hands. (Tr. at 18). Also, Claimant reported that she could care for her grandchildren, drive, perform household chores, prepare food, shop, and perform personal care independently. (*Id.*). The ALJ considered the prior administrative findings of the state agency physicians regarding Claimant's functional abilities and found them to be persuasive. (Tr. at 19). Notably, neither physician assessed any manipulative limitations. (Tr. at 58, 72). Therefore, the functional effects of Claimant's hand impairment were considered in the RFC finding and ultimate disability decision. For those reasons, the undersigned **FINDS** that the ALJ's step two finding regarding Claimant's hand impairment is supported by substantial evidence.

### B. Mental Impairments

Claimant next argues that the ALJ erred by not assessing RFC restrictions to account for her mild mental limitations or explaining why restrictions were not

warranted. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.*

According to SSR 96-8p, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges

and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

As discussed, the ALJ applies a special technique to evaluate mental impairments, which includes rating the severity of functional limitations in the "paragraph B" categories of (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself. The ALJ uses a five-point scale, ranging from no, mild, moderate, marked, and extreme limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2)(a)-(e). As relevant here, a finding of "no limitation" reflects that the claimant is able to function in that category area "independently, appropriately, effectively, and on a sustained basis" whereas a finding of "mild limitation" means that the claimant's ability to do so is "slightly limited." *Id.* at § 12.00F(2)(a), (b).

19

In this matter, the ALJ found that Claimant had mild limitations in all four paragraph B categories. In the area of understanding, remembering, or applying information, the ALJ cited that Claimant was diagnosed with depression and reported issues making decisions and understanding what she read, but her memory and ability to understand or apply information was unimpaired on examination. (Tr. at 13). In terms of interacting with others, the ALJ again noted that Claimant was treated for depression with medication, but considered that Claimant remained able to go places daily; went to her grandchild's gymnastics class, church, and stores; and reported no problems socializing. (*Id.*). Concerning the category of concentrating, persisting, or maintaining pace, the ALJ likewise considered Claimant's diagnosis and treatment for depression and her reported issues with concentration and completion of tasks, but the ALJ noted that Claimant's treatment notes did not reflect any impairment with concentration, persistence, or maintaining pace. (*Id.*). Finally, with regard to Claimant's ability to adapt or manage herself, the ALJ cited Claimant's examinations reflecting normal mood and affect and Claimant's reports that she tried to stay active with her grandchildren, could perform activities of daily living with no limitations, drove, cared for her grandchildren, prepared food, shopped, performed her own personal care and household chores, and attended church. (Tr. at 14).

Claimant contends that, although the ALJ acknowledged that the paragraph B ratings were not an RFC assessment, he never proceeded to analyze her mental functional limitations in more detail. However, the ALJ explicitly explained that the overall evidence indicated that Claimant's mental impairment of depression did not result in any functional limitations, and the ALJ did not include any mental limitations in the RFC assessment for that reason. (Tr. at 14 n.1). In the RFC analysis, the ALJ considered

Claimant's complaints that she had issues with her memory after a transient ischemic attack and that depression made it difficult for her to make decisions. (Tr. at 18). Yet, the ALJ noted that the medical records reflected Claimant's normal mental examinations and conservative treatment with medication. (*Id.*). In addition, the ALJ cited that Claimant was able to perform most activities of daily living with few reported problems. (*Id.*). She could care for her grandchildren, attend social engagements, drive, perform household chores, prepare food, shop, and maintain her own hygiene. (*Id.*).

The above analysis very clearly allows for meaningful review of the ALJ's determination that Claimant did not have any mental RFC restrictions. It is easily distinguished from *Shank*, which Claimant cited, and other prior cases that were remanded because the ALJ did not provide any insight into the absence of RFC restrictions despite mild paragraph B findings. *Shank v. Saul*, No. 3:20-CV-00444, 2021 WL 2767063, at *8 (S.D.W. Va. June 11, 2021), *report and recommendation adopted,* 2021 WL 2744550 (S.D.W. Va. July 1, 2021); *see also* Jones v. Kijakazi, No. 5:21-cv-00634 (S.D.W. Va. Sept. 22, 2022), ECF No. 18, *report and recommendation adopted*, ECF No. 19 (S.D.W. Va. Nov. 28, 2022). Here, the ALJ explicitly explained that, based on Claimant's subjective allegations, diagnosis, and treatment for depression, her ability to function in the paragraph B criteria was mildly limited. However, the slight limitations did not restrict her RFC to do mental work activities.

The ALJ's findings are supported by substantial evidence in the record. As Claimant admits, her depression was controlled on medication from her primary care provider during the relevant period. (ECF No. 8 at 3). She displayed good judgment and normal mood during appointments, and she remained active and alert. (Tr. at 485, 489, 493, 504, 517). The benign findings continued after her date last insured. *See, e.g.*, (Tr. at

662). Furthermore, Claimant was examined by a consultative psychologist in March 2020, a few months after her date last insured. (Tr. at 625). The state agency psychologists reviewed the entire record, including that consultative examination report, and concluded that Claimant had mild limitations in the paragraph B categories, but she did not have any functional deficits related to a mental disorder. (Tr. at 55-56, 69-70). Although the ALJ did not articulate his consideration of the prior administrative findings regarding Claimant's mental impairments, that evidence is certainly consistent with his findings. (Tr. at 16-20).

Claimant does not point to any critical conflicting evidence, or any evidence at all, that the ALJ overlooked. Rather, Claimant argues that the ALJ failed to explain how he considered the step two findings regarding Claimant's mental impairments in the RFC analysis, which precludes meaningful review of the decision. (ECF No. 10 at 2). For the reasons stated above, the ALJ explained that Claimant's slight mental limitations did not impose work-related restrictions. Although brief, the ALJ's explanation provided sufficient detail to allow meaningful review, and the findings are supported by more than a scintilla of evidence in the record. For those reasons, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's mental impairments is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 8); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 9); and **DISMISS** this action from the docket of

the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 26, 2023

_____
Cheryl A. Eifert
United States Magistrate Judge